**Marjorie H. ROWLAND,**
**Plaintiff-Appellee,**

v.

**MAD RIVER LOCAL SCHOOL DISTRICT, MONTGOMERY COUNTY, OHIO, a public body corporate, Defendant-Appellant,**

**Robert L. Bell, et al., Defendants.**

**No. 82–3218.**

United States Court of Appeals,
Sixth Circuit.

Argued June 29, 1983.

Decided March 22, 1984.

Rehearing and Rehearing En Banc
Denied June 4, 1984.

Michael J. Burdge, argued, Dayton, Ohio, for defendant-appellant.

Alexander M. Spater, Spater, Gittes & Terzian, Columbus, Ohio, Michael D. Simpson, argued, Nat. Educ. Ass'n, Michael H. Gottesman, Bredhoff & Kaiser, Michael D. Simpson, Peter O. Shinevar, Washington, D.C., for plaintiff-appellee.

Leonard Graff, Legal Director, Nat. Gay Rights Advocates, San Francisco, Cal., for amicus curiae Nat. Gay Rights Advocates.

Before LIVELY, Chief Judge, and EDWARDS and KRUPANSKY, Circuit Judges.

LIVELY, Chief Judge.

The school district appeals from a judgment in favor of a non-tenured guidance counselor who was suspended, then transferred and finally not rehired at the end of her one-year appointment. The question presented is whether these actions deprived the plaintiff of her right to freedom of speech under the First Amendment or to equal protection of the law under the Fourteenth Amendment to the Constitution. We conclude that under the facts of this case neither constitutional deprivation occurred, and reverse the judgment of the district court.

## I.

The plaintiff began working as a vocational guidance counselor at Stebbins High School in Montgomery County, Ohio in August 1974 under a limited one-year contract. A short time later she told a secretary in an office she shared with other vocational education personnel that two of the students she was counseling were homosexual. During the same period in the fall of 1974 the plaintiff told the same secretary that she, the plaintiff, was bisexual and that she had a female lover. She also informed the assistant principal of the school and several teachers who were personal friends that she was bisexual. In December the plaintiff had a meeting with the principal of Stebbins, the defendant DiNino, and he suggested that she resign. The plaintiff refused to resign and then told several other Stebbins teachers that she had been asked to resign because she was bisexual, and sought their support. Following another meeting with DiNino, the defendant Hopper who was superintendent of the district, and the district's attorney, the plaintiff again refused to resign. Plaintiff's attorney also attended this meeting.

Following the second refusal to resign the plaintiff was suspended with full pay for the remainder of the contract year. She then filed the first of two actions in the district court. When the district court entered a preliminary injunction against her suspension, plaintiff was reassigned to a position involving development of a career education curriculum. This was a position with no student contact. In March 1975 DiNino recommended that the contract of the plaintiff, along with those of several other Stebbins teachers, not be renewed. Superintendent Hopper concurred, and the plaintiff was informed of the recommendation. At a regular meeting of the school board the recommendation to not renew Rowland's contract was unanimously adopted without independent investigation. The plaintiff filed a second action in the district court charging that the reassignment and failure to renew her contract violated a number of her constitutional rights. The defendants in both actions were the school district, the president and members of the board of the district, the superintendent of the district and the principal of Stebbins High.

## II.

### A.

In her first district court complaint the plaintiff set forth five causes of action. In the first of these she sought damages pursuant to 42 U.S.C. § 1983, claiming that the act of the defendants in suspending her without a hearing violated her right to due process under the Fourteenth Amendment. The district court granted summary judgment in favor of the defendants on this claim, on two claims attacking the constitutionality of several Ohio statutes and on a state claim brought under pendent jurisdiction. The plaintiff appealed to this court and we affirmed summary judgment for the defendants on all four claims in an unpublished order. The district court severed the fifth claim in the first action and consolidated it with the second action. In this severed and consolidated claim the plaintiff charged violation of her right of privacy under the First, Fourth, Fifth, Ninth and Fourteenth Amendments to the Constitution in that she was suspended

solely because she was bisexual. Thus, the suspension, transfer and nonrenewal claims were all before the district court in the remaining action.

Thereafter the district court dismissed all claims, *sua sponte*, upon finding that sexual preference is not a constitutionally protected interest. On appeal this court noted that none of the circumstances surrounding the decision of the defendants to not renew Ms. Rowland's contract had been developed and concluded that dismissal on the pleadings was improper. In an unpublished order, 615 F.2d 1362 (6th Cir.1980) the judgment dismissing the complaint was vacated and the cause was remanded for further proceedings. Upon return to the district court the case was assigned to a United States Magistrate and the parties agreed to a jury trial before, and the entry of final judgment by, the magistrate.

### B.

The magistrate determined to submit the issues, as he perceived them, to the jury in the form of a series of "special verdicts." Though all parties submitted extensive proposed instructions, the magistrate gave none of them, concluding that the alternative to special verdicts would be "a short course on the Constitution." In special verdicts 1 through 3 the jury found that neither plaintiff's disclosure to the secretary of her love for another woman, nor her statements to the assistant principal and to other teachers concerning her bisexuality interfered with the proper performance of anyone's duties or with the operation of the school generally. In the same verdicts the jury found that the decision to suspend the plaintiff was motivated at least in part by these statements regarding her bisexuality. In special verdict 4 the jury found that the decisions to transfer and to not renew her contract were not motivated even in part by the fact that plaintiff had filed a law suit regarding her suspension.

In special verdict 5 the jury found that in suspending and transferring her the defendants treated the plaintiff differently from similarly situated employees "because she was homosexual/bisexual." The jury also found that DiNino and Hopper treated her differently from similarly situated employees in recommending that plaintiff's contract not be renewed, but that the board of education did not treat her differently in voting not to renew Ms. Rowland's contract. In the same special verdict the jury found that at the time of her suspension the plaintiff was not performing as a vocational guidance counselor in a satisfactory manner "because she revealed to Mrs. Monell [the secretary] the sexual orientation of two students when it was not necessary to do so."

In special verdict 6 the jury found that defendants DiNino and Hopper acted in good faith in all their actions regarding plaintiff and in special verdict 7 that the board of education acted for no other reason than the recommendation of the defendant Hopper in voting not to renew Ms. Rowland's contract. In special verdict 8 the jury found that if plaintiff "had not been bisexual and if she had not told Mrs. Monell, the secretary, of her sexual preference," she would not have been suspended or transferred and the board of education would not have failed to renew her contract "anyway for other reasons."

### C.

On the basis of the special verdicts the magistrate entered an order finding in favor of the school board members in their individual capacities, and in favor of the defendants DiNino and Hopper "on all issues in the complaint" because they acted in good faith. However, he found in favor of the plaintiff and against the school district for the suspension and transfer of plaintiff "in violation of her rights to equal protection of the law and free speech" and for nonrenewal of her contract "in violation of her right to free speech." The jury then awarded damages of $13,500 for personal humiliation, mental anguish and suffering proximately caused by plaintiff's suspension, no damages for her transfer, and damages of $26,947 for loss of earnings

proximately caused by nonrenewal of her contract. The jury found that plaintiff had suffered no loss of reputation or standing in the community and no personal humiliation, mental anguish or suffering as the result of the failure to renew her contract.

The magistrate found that the school district was liable for damages resulting from the plaintiff's suspension because the defendant Hopper was acting on behalf of the school district when he suspended her. Though Hopper was entitled to good faith immunity, the school district did not share this immunity, the magistrate held, because Hopper was acting "within the sphere of his authority as a policy-maker or decision-maker." The magistrate held that special verdict 5, which found that the school board did not treat plaintiff differently from similarly situated employees because of her sexual preference in failing to renew her contract, determined that the school district did not violate Rowland's right to equal protection of the law by not renewing her contract. Nevertheless, he held the school district liable on the equal protection claim because of Hopper's action in suspending and transferring the plaintiff. He also construed special verdict 7, that the school board voted to not renew the contract solely on the basis of Hopper's recommendation, as a determination that plaintiff's right to freedom of speech was infringed by the nonrenewal action of the board.

### III.

The district court awarded damages against the school district on two theories: (1) That the school district violated plaintiff's Fourteenth Amendment right to equal protection of the law by suspending her because she is bisexual or homosexual; and (2) That the school district violated plaintiff's First Amendment right to freedom of speech by not renewing her one-year contract because she told Mrs. Monell, the secretary, Mr. Goheen, the assistant principal, and other teachers of her bisexuality. We conclude that the record does not support a finding that plaintiff established either constitutional violation.

### A.

As this court held in *Ryan v. Aurora City Board of Education*, 540 F.2d 222, 227 (6th Cir.1976), *cert. denied*, 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977), "a non-tenured teacher has no 'expectancy' of continued employment, whatever may be the policies of the institution, where there exists a statutory tenure system." Ohio has a statutory tenure system under which only tenured teachers acquire a property interest in their jobs. Thus this case comes under the rule that judicial review of actions of school authorities involving the administration of state teacher tenure laws is in the state rather than the federal courts unless the actions involve the deprivation of constitutional rights delineated by this court. *Id.* at 226. This delineation was made in *Orr v. Trinter*, 444 F.2d 128 (6th Cir.1971), *cert. denied*, 408 U.S. 943, 92 S.Ct. 2847, 33 L.Ed.2d 767 (1972), where former Chief Judge Harry Phillips wrote for the court:

... it is no longer open to debate that plaintiff would be entitled to relief if the board had refused to rehire him because he had exercised his rights as guaranteed by the free speech clause of the First Amendment. *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 [1968]; *Board of Trustees of Arkansas A & M College v. Davis*, 396 F.2d 730 (8th Cir. [1968]), cert. denied, 393 U.S. 962, 89 S.Ct. 401, 21 L.Ed.2d 375 [1968]; by the self incrimination clause of the Fifth Amendment, *Slochower v. Board of Higher Education*, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 [1959]; by the due process clause of the Fifth or Fourteenth Amendments, *Greene v. McElroy*, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 [1959]; or by the equal protection clause of the Fourteenth Amendment, *Hatton v. County Board of Education*, 422 F.2d 457 (6th Cir. [1970]); *Rolfe v. County Board of Education*, 391 F.2d 77 (6th

Cir. [1968]). These are constitutionally impermissible reasons for refusal to rehire a teacher.

444 F.2d at 134. Two of the constitutional deprivations listed in *Orr* are claimed in this case. The finding of a First Amendment violation is based on special verdict 7 that the board of education knowingly and intentionally voted to not renew the plaintiff's contract solely on the basis of Superintendent Hopper's recommendation which was motivated in part by her statements to Mrs. Monell, Mr. Goheen and other teachers. The finding of an equal protection violation is based on special verdict 5 that DiNino and Hopper treated the plaintiff differently from similarly situated employees in suspending and transferring her because she is bisexual. We will examine the constitutional claims separately.

### B.

### The First Amendment Claim

■ The magistrate did not have the benefit of the recent decision of the Supreme Court in *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). In *Connick* the Court held that "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." 103 S.Ct. at 1690 (citation omitted). Earlier in the *Connick* opinion Justice White had stated the rule somewhat more concisely. After emphasizing the fact that *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and its antecedents and progeny were concerned with safeguarding speech on matters of public concern, he wrote for the Court that if a public employee's statements cannot be fairly characterized as constituting speech on a matter of public concern, "it is unnecessary for us to scrutinize the reasons for her discharge." 103 S.Ct. at 1689 (footnote omitted).

Under the *Connick* test Ms. Rowland's statements were not protected speech. It is clear that she was speaking only in her personal interest. There was absolutely no evidence of any public concern in the community or at Stebbins High with the issue of bisexuality among school personnel when she began speaking to others about her own sexual preference. Moreover, Ms. Rowland told Mrs. Monell in confidence of her love for another woman and she asked the assistant principal to keep her revelation to him of her bisexuality confidential. When the plaintiff talked to other teachers about her sexual preference after the meeting with DiNino it was for the purpose of enlisting their aid in her efforts to remain at Stebbins High as a guidance counselor. Ms. Rowland's requests for confidentiality and the context of her discussions with others indicate that she did not consider her statements to be on matters of public concern. Thus, Ms. Rowland's own treatment of the issue of her sexual preference indicates that she recognized that the matter was not one of public concern. Her statements, like those of the plaintiff in *Connick*, were made as part of an individual effort to avoid unfavorable action by her employer. Finally, the record discloses no unusual circumstances which would have taken this case out of the *Connick* rule. The defendants were entitled to judgment as a matter of law on the First Amendment issue.

### C.

### The Equal Protection Claim

■ The finding of the magistrate on the equal protection claim contains ambiguities. He found that the school district did not violate Ms. Rowland's right to equal protection in voting to not renew her contract. That finding conforms to special verdict 5. In the same special verdict the jury found that the defendants DiNino and Hopper treated Ms. Rowland differently from similarly situated employees in suspending and transferring her "because she was homosexual/bisexual." Also in verdict 5 the jury found that the plaintiff was not

performing satisfactorily as a vocational guidance counselor. The jury identified her unsatisfactory conduct as disclosing to a third party that two of the students at the school were homosexual. This was a breach of confidence which reflected seriously on the plaintiff's judgment and qualifications as a counselor and would have been sufficient reason to suspend and reassign her. Under *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977), where both permissible and impermissible reasons for disciplining a public employee are established, the court must decide whether "the Board ha[s] shown by a preponderance of the evidence that it would have reached the same decision as to [the plaintiff's] reemployment even in the absence of the protected conduct." The magistrate apparently attempted to obtain a jury finding on the *Mt. Healthy* question in special verdict 8 where it was asked whether if the plaintiff "had not been bisexual *and* if she had not told" others of her sexual preference, she would have been suspended and transferred "anyway for other reasons." The problem with this question is that it did not isolate the impermissible reason. The matter of her unsatisfactory performance was not included in the question to the jury. Further, we have held it was not impermissible to discipline the plaintiff for making statements about her sexual preference. Assuming that it was impermissible to do so for being bisexual, it is impossible to tell whether the jury found that plaintiff was suspended and transferred merely for being bisexual or for talking about it. All the jury found was that this discipline was imposed for a combination of being bisexual and of making statements to others of her sexual preference. Even if there were no other grounds for reversing the equal protection award it would be necessary to remand for a proper *Mt. Healthy* determination.

Additionally, in colloquy with counsel about the special verdict question which asked whether Ms. Rowland had performed her job satisfactorily the magistrate stated:

I think that in order to prove discrimination, the plaintiff has to prove that she was performing her job properly and then was fired or action was taken for no apparent legitimate reason.

If you fail to prove that you're performing your job properly, I don't think you've made a prima facie case of discrimination. That's why that question is in there.

Tr. Vol. IV p. 203. Clearly the plaintiff failed to prove that she was performing her job properly. The jury found that her breach of confidence concerning two advisees constituted unsatisfactory performance. Yet the magistrate totally ignored this finding in his opinion. He made no equal protection analysis to determine whether suspension with pay was a rational response to such improper performance, but appeared to assume that the answers to other special verdicts made this finding irrelevant.

There are other errors which require reversal and dismissal. There was absolutely no evidence to support the finding that Ms. Rowland was treated differently from other similarly situated employees. There was no evidence of how other employees with different sexual preferences were treated. Neither DiNino nor Hopper was asked a hypothetical question concerning the treatment of similarly situated employees. The jury was puzzled by the questions in special verdict 5 and asked for definition of "similarly situated." In colloquy with counsel before answering the inquiry the magistrate stated "there really isn't any evidence in this case on any similarly situated employee anyway." Tr. Vol. IV, p. 353. Thus he required the jury to make findings on an issue which he recognized as having been the subject of no proof. This was plain error. Since plaintiff failed to produce any proof that she was treated differently from other similarly situated employees there was nothing to submit to the jury on this issue.

■ In finding the school district liable for Hopper's actions the magistrate concluded that the superintendent was acting

for the district in suspending and transferring the plaintiff. There is no doubt that Hopper acted for the board, but that is not sufficient to hold the school district liable. In overruling its previous decisions granting political subdivisions immunity in § 1983 actions the Supreme Court made it clear that a local government cannot be held liable on a *respondeat superior* theory. *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). Liability may be predicated, however, upon an unconstitutional act performed by an officer or employee in carrying out a policy or custom of the employer. *Id.* at 690–91, 98 S.Ct. at 2035–36. There was no evidence that Hopper was carrying out a policy or custom of the school district in suspending and transferring the plaintiff. The magistrate ruled that there was no official policy of the school district with respect to homosexuals and bisexuals, and the plaintiff did not object. There was also no proof of a policy or custom of suspending guidance counselors for their sexual preferences. The district cannot be held liable for an action of an employee which was totally unrelated to any policy or custom of his public employer.

The plaintiff argues that she was injured by an unconstitutional act and is entitled to compensation, citing *Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). She argues that Hopper was a "decisionmaker" who made policy in the areas of suspension and transfer. However, there was no evidence that in making the single, discrete decision to suspend Ms. Rowland, the superintendent was either executing or implementing policy or custom. See *Dunn v. State of Tennessee,* 697 F.2d 121, 128 (6th Cir.1982) *cert. denied,* —— U.S. ——, 103 S.Ct. 1778, 76 L.Ed.2d 349 (1983); *Johnson v. Granholm,* 662 F.2d 449 (6th Cir.1981), *cert. denied,* 457 U.S. 1120, 102 S.Ct. 2933, 73 L.Ed.2d 1332 (1982). The reference to "decisionmaker" in *Owen* does not weaken or dispense with the rule that local governments are liable for constitutional torts of their employees only when inflicted in the execu-

tion or implementation of policy or custom. The holding in *Owen* was that a local government has no immunity from liability under § 1983 flowing from its constitutional violations and that it cannot assert the good faith immunity of its officers as a defense. The Court in *Owen* did not alter the *Monell* requirement that the action be taken in the implementation or execution of official policy or custom. *Owen,* 445 U.S. at 655 n. 39, 100 S.Ct. at 1417 n. 39.

It is clear that the board was not involved in the decision to suspend and transfer Ms. Rowland. The decisions were made by Hopper in consultation with DiNino. The plaintiff made no claim that the school board should have overruled the superintendent's decisions and made no objection to the magistrate's failure to submit a question concerning its inaction for a special verdict. The plaintiff failed to carry her burden of proof that the school district was liable for her suspension and transfer, assuming either or both actions by the superintendent were impermissible.

We conclude that the defendant-appellant Mad River Local School District was entitled to judgment on both the First and Fourteenth Amendment claims. Though other constitutional violations were pled, the plaintiff permitted the case to be submitted without objection on claims of free speech, equal protection and access to the courts only. The jury's finding that no disciplinary measures were taken in retaliation for Ms. Rowland's suit against the defendants eliminated the access claim. This opinion disposes of the free speech and equal protection claims.

The dissent's gratuitous statement that the majority treats this case as one involving a sick person is totally wrong. It is true that plaintiff has attempted to make homosexual rights the issue in this case. However, her personal sexual orientation is not a matter of public concern, and we have decided the First Amendment issue on the basis of the latest Supreme Court treatment of legally similar claims. And, as we have pointed out, the plaintiff sought to prevail on her equal protection claim with-

out any showing that heterosexual school employees in situations similar to hers have been, or would be, treated differently for making their personal sexual preferences the topic of comment and discussion in the high school community. Again, this is nothing more than the required analysis of an equal protection claim.

The judgment of the district court is reversed with directions to enter judgment for the appellant. No costs are taxed on appeal.

GEORGE CLIFTON EDWARDS, Jr., Circuit Judge, dissenting.

Respectfully, I dissent.

This school teacher has been deprived of her job solely because she let it be known to some colleagues and, through them, to her administrative superiors that her sexual preference was for another woman. She filed a 42 U.S.C. § 1983 complaint alleging violations of federal constitutional rights, particularly as set forth in the first and fourteenth amendments. A southwestern Ohio jury has now found in her favor on all relevant counts and has awarded substantial money damages. The Magistrate before whom the case was tried and the District Judge have entered judgment in her favor. I would affirm.

This record presents a clear cut issue as to whether a citizen's mere statement of a homosexual preference may be punished by job loss by the joint decision of a school superintendent, a public school principal and assistant principal, and the school board, as a matter of institutional policy. I find no language in the Constitution of the United States which excludes citizens who are bisexual or homosexual from its protection, and particularly of the protection of the first and fourteenth amendments thereto. The Constitution protects all citizens of the United States; no language therein excludes the homosexual minority. Like all citizens, homosexuals are protected in these great rights, certainly to the extent of being homosexual and stating their sexual preference in a factual manner where there is no invasion of any other person's rights.

While the Supreme Court of the United States has not, to this date, decided this specific issue, it has also decided no case to the contrary of the view expressed above.

### I. The First Amendment

In particular I cannot agree with the majority that Justice White's opinion in *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) supports the plaintiff's termination in this case. I do not view this discharge (or failure to rehire) as based upon this employee's "behavior." There is neither charge nor proof of anything plaintiff did which led to the termination, other than being bisexual and expressing the fact. If we recognize her right to a jury trial, we must also accept the jury's conclusion that if plaintiff "had not been bisexual and if she had not told Mrs. Monell, the secretary, of her sexual preference," she would not have been suspended or transferred and the Board of Education would not have failed to renew her contract "anyway for other reasons." Special Verdict VIII, Appendix A. Clearly under this jury finding it was "speech" which occasioned her termination.

The detailed findings of the jury, set forth in Appendix A to this dissent, make equally clear that it was not the fact that plaintiff told a secretary in her office that two students she was counseling were homosexual that caused her to not be rehired. *Id.*

Like the majority, I recognize that under the *Connick* case, appellant cannot prevail on her first amendment claim if the speech is "not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest ...." 461 U.S. 138, 103 S.Ct. 1684, 1690 (1983). While, for all this record shows, her first disclosure to the secretary may have been intended to be confidential, plaintiff's later statements were clearly a part of an effort to establish her right to her job while admitting being bisexual. Long before her nonrenewal/discharge, plaintiff became a center of public controversy in the Mad

River School community involving the same issue of homosexual rights which has swirled nationwide for many years. This record leaves no doubt but that her statements about her status resulted in "public concern"—both pro and con. As the Supreme Court has consistently held:

First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students. It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate. This has been the unmistakable holding of this Court for almost 50 years.

*Tinker v. Des Moines School District,* 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1968).

To summarize the first amendment aspect of this case, the speech may not have had its origin in an overt attempt to exercise freedom of speech. But speech it was. It revealed plaintiff's status as a homosexual in what at the outset she may have presumed to be a confidential relationship. When, however, that speech was spread to school authorities and the community, plaintiff's adherence to her right both to be what she was and to state the fact brought down on her head the wrath of some parents and termination of her job by the ruling authorities of her school. There is evidence in this record that organized parental pressures were involved in the ultimate nonrenewal/discharge. Clearly at the point of discharge, there was a controversy in process over an important public issue.

While this incident did not generate national attention, in southern Ohio it was an important matter of public concern. It thus became a part of the nationwide debate on homosexuality and the rights or lack thereof of homosexuals—a debate of far greater significance than the majority

opinion recognizes. *See People v. Onofre,* 51 N.Y.2d 476, 434 N.Y.S.2d 947, 415 N.E.2d 936 (1980), *cert. denied,* 451 U.S. 987, 101 S.Ct. 2323, 68 L.Ed.2d 845 (1981). *See also New York v. Uplinger,* 58 N.Y.2d 936, 460 N.Y.S.2d 514, 447 N.E.2d 62 (1983), *cert. granted,* —— U.S. ——, 104 S.Ct. 64, 78 L.Ed.2d 80. (1983).

## II. Equal Protection

Turning now to the fourteenth amendment aspect of this case, I perceive no reason to deny plaintiff her rights under the equal protection clause of that amendment. Assume for a moment that all the same facts applicable to this case were before us in a case where the first disclosure to the secretary had been by a teacher whose appearance was consistent with majority race status, but who revealed she had a black parent. If community protests in this rural southwest Ohio county had convinced the principal and school board to non-renew that teacher, would there be any doubt about whether or not this was "policy" and a case for a federal constitutional remedy. I find no logical equal protection distinction between these two minority discrimination situations, both of which evoke deeply felt prejudices and fears on the part of many people.[1] I believe that all of the many federal cases which have held on equal protection grounds that school authorities could not discharge teachers for racially discriminatory reasons without offending the fourteenth amendment to the U.S. Constitution and which have invoked a federal court remedy are equally applicable to this case. *McFerren, Jr., et al. v. County Board of Education,* 455 F.2d 199 (6th Cir.), *cert. denied,* 407 U.S. 934, 92 S.Ct. 2461, 32 L.Ed.2d 817 (1972); *Hatton v. County Board of Education,* 422 F.2d 457 (6th Cir.1970); *Rolfe v. County Board of Education,* 391 F.2d 77 (6th Cir.1968).

I would also hold that there is no need for a *Mt. Healthy* remand before affirming the judgment of the district court. *Mt.*

---

**1.** It is, of course, historic fact that Congress' dominant concern in adopting the fourteenth amendment was to protect the rights of the newly freed slaves. Nonetheless the amendment's general language contains no restriction and has been applied generally to situations which were never discussed in the debate which preceded its adoption and ratification. *See,* for only one example, the *Slaughter-House Cases,* 83 U.S. (16 Wall.) 36, 21 L.Ed. 394 (1873).

*Healthy v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). She was bisexual by preference. She said so. She was fired because she was a homosexual who revealed her sexual preference—and, as the jury found, for no other reason. *See* Special Verdict VIII(5), Appendix A.

The majority also would remand the case because of inadequate evidence of disparate treatment, despite a jury finding that Rowland was treated differently than other employees because of her sexual preference. *See* Special Verdict, Appendix A. The jury had heard ample evidence to find that, but for the fact that she revealed her sexual preference, she would not have been either transferred, or suspended by Superintendent Hopper and Principal DiNino, or "non-renewed" by the Board. The School District has not challenged these findings. The jury clearly did not believe that the above actions would have been taken against Rowland if she had not admitted a sexual preference which Superintendent Hopper, Principal DiNino and, ultimately, the School Board disapproved of. The question was one of credibility and logical inference which the jury was uniquely positioned to resolve.

### III. Immunity Under 42 U.S.C. § 1983

As we have seen earlier, there is no obstacle to imposing § 1983 liability on the school district. The individuals who acted in this case, the superintendent of schools, and the school board, are school district policymakers who, beyond a doubt, formulated and executed school district policy in the discharge/nonrenewal of this teacher because of her sexual preference. *Monell v. New York City Department of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1977). *See Owen v. City of Independence, Mo.*, 445 U.S. 622, 656, 100 S.Ct. 1398, 1418, 63 L.Ed.2d 673 (1980). The Sixth Circuit cases cited by the majority are distinguishable, and do not immunize the school district.

### IV. The Reality of This Case

My colleague's opinion seems to me to treat this case, *sub silentio*, as if it involved only a single person and a sick one

at that—in short, that plaintiff's admission of homosexual status was sufficient in itself to justify her termination. To the contrary, this record does not disclose that she is subject to mental illness; nor is she alone.

Careful studies of homosexuality have now established two facts of which the courts should be aware and should take judicial notice. The first is that homosexuality is not a mental disease, like insanity or a psychopathic personality. The second is the extent of homosexuality in the United States.

In 1979, the Surgeon General issued a memorandum as follows:

PHS policy regarding certification of mental defect or disease under Title 8, section 1224 United States Code

The public Health Service policy regarding the physical and mental examination of aliens pursuant to Title 8, section 1224 of the United States Code has been revised. According to this revision homosexuality per se will no longer be considered a "mental disease or defect." This revision has been made for two reasons: First, the change will reflect current and generally accepted canons of medical practice with respect to homosexuality. Specifically, according to the 1974 edition of the Diagnostic and Statistical Manual II (DSM II) of Mental Disorders of the American Psychiatric Association homosexuality is not considered to be a mental disorder. (Note: The DSM is one of the most authoritative diagnostic manuals for the conduct of psychiatric examinations in the United States, and constitutes the complete listing of currently recognized psychiatric diagnoses.) This manual states that "homosexuality per se is one form of sexual behavior, and with other forms of sexual behavior which are not by themselves psychiatric disorders are not listed in this nomenclature."

The newest edition of the DSM (DSM III) has been approved by the Board of Trustees of the American Psychiatric Association and will be released in November

1979. In the DSM III a decision not to include homosexuality as a psychiatric disorder has been sustained.

The American Psychiatric Association's actions have been endorsed by official resolutions adopted by the American Psychological Association, the American Public Health Association, the American Nurses' Association and the Council of Advanced Practitioners in Psychiatric and Mental Health Nursing of the American Nurses' Association.

The Public Health Service has traditionally relied upon the professional expertise of associations such as these for advice and information on a wide variety of physical and mental health issues. Accordingly, this change in the policy of the PHS with respect to the physical and mental examination of aliens has been made to reflect the most current judgments of health professionals on this subject.

The second reason for this change is that the determination of homosexuality is not made through a medical diagnostic procedure.

Effective this date, PHS medical officers, civil surgeons, and panel physicians will no longer certify that homosexuality per se is a mental disease or defect.

Quarantine inspectors will no longer issue medical holds on aliens suspected solely of being homosexual.

The Immigration and Naturalization officials and Department of State Consular officers will be advised of this change and will be advised that in accord with this change they should no longer refer aliens suspected only of being homosexual to the PHS for certification of a mental disease or defect under 8 USC 1224. Please notify all relevant Public Health Service personnel that, for the foregoing reasons, PHS medical officers shall not issue certificates or notifications relating to mental defects or diseases under 42 CFR 34.7 solely because an alien is suspected of being a homosexual.

56 *Interpreter Releases* 398–99 (August 17, 1979).

While this statement directly related to exclusion from the United States of aliens seeking admission either as visitors or permanent residents, and the Attorney General, in a subsequent memorandum, disavowed its impact, the Surgeon General's memorandum is nonetheless an authoritative statement of modern medical opinion concerning homosexuality.

In dealing with this type of case, this court (and others) should be aware and take judicial notice of the monumental works concerning the incidence of homosexuality in males and females in the United States. *See* A. Kinsey, W. Pomeroy & C. Martin, *Sexual Behavior in the Human Male* (1948); A. Kinsey, W. Pomeroy, C. Martin & P. Gebhard, *Sexual Behavior in the Human Female* (1953); A. Bell & M. Weinberg, *Homosexualities: A Study of Diversity Among Men and Women* (1978). The following sentences represent cumulative summaries of Kinsey's authoritative works on homosexual incidence in males and females:

> In these terms (of physical contact to the point of orgasm), the data in the present study indicate that at least 37 per cent of the male population has some homosexual experience between the beginning of adolescence and old age (U.S. Corrections. See Table 139, Figure 156).

Kinsey et al., *Sexual Behavior in the Human Male* 623 (1948).

\* \* \* \* \* \*

> [T]he accumulative incidences of overt contact to the point of orgasm among the females had reached 13 per cent (Table 131, Figure 82); among the males they had reached 37 per cent.

Kinsey et al., *Sexual Behavior in the Human Female* 474–75 (1953).

Perhaps the quickest summary of Kinsey's work is found in Marmor, *Homosexual Behavior: A Modern Reappraisal* (1980):

> The Kinsey reports represent the most thorough and extensive surveys done to date. A number of smaller studies have been made in Europe, and all are in ap-

proximate agreement with the Kinsey findings (Romer, 1906; Hirschfeld, 1920; Friedeberg, 1953; and Schofield, 1965). On the basis of these various studies it is fair to conclude, conservatively, that the incidence of more or less exclusively homosexual behavior in Western culture ranges from 5 to 10 percent for adult males and from 3 to 5 percent for adult females. If bisexual behavior is included, the incidence may well be twice these figures. It is clear, therefore, that the propensity for homosexual reactivity is a widespread one even in societies such as ours which strongly discourage it.

On the facts and circumstances presented here, I would affirm the jury's verdict and the judgment entered by the Magistrate and the District Judge.

## APPENDIX A

### SPECIAL VERDICT I

During the fall of 1974, Mrs. Rowland told Elaine Monell, the secretary, that she, Mrs. Rowland, was in love with a woman.

1. Did Mrs. Rowland's statement to Elaine Monell regarding Mrs. Rowland's love for a woman in any way interfere with the proper performance of either Mrs. Rowland's or Elaine Monell's duties or with the regular operation of the school generally? (In order to answer "NO", you must be satisfied by a preponderance of the evidence that it did not.)

          YES      ✓ NO

2. If your answer to question 1 was "YES", state in the notebook provided how the statement in question interfered with the performance of duties and/or how it interfered with the regular operation of the school.

3. Are you satisfied by a preponderance of the evidence that Defendant DiNino's participation in the decision to suspend Mrs. Rowland was motivated at least in part by her statement to Elaine Monell regarding her bisexuality?

     ✓  YES        NO

4. Are you satisfied by a preponderance of the evidence that Defendant Hopper's suspension of Mrs. Rowland was motivated at least in part by her statement to Elaine Monell regarding her bisexuality?

     ✓  YES        NO

5. Are you satisfied by a preponderance of the evidence that Defendant DiNino's participation in the decision to transfer Mrs. Rowland to a position with no student contact was motivated at least in part by her statement to Elaine Monell regarding her bisexuality?

     ✓  YES        NO

6. Are you satisfied by a preponderance of the evidence that Defendant Hopper's transfer of Mrs. Rowland to a position with no student contact was motivated at least in part by her statement to Elaine Monell regarding her bisexuality?

     ✓  YES        NO

7. Are you satisfied by a preponderance of the evidence that Defendant DiNino's participation in the recommendation to the Board of Education that Mrs. Rowland's contract not be renewed was motivated at least in part by her statement to Elaine Monell regarding her bisexuality?

     ✓  YES        NO

8. Are you satisfied by a preponderance of the evidence that Defendant Hopper's recommendation that Mrs. Rowland's contract not be renewed was motivated at least in part by her statement to Elaine Monell regarding her bisexuality?

     ✓  YES        NO

### SPECIAL VERDICT II

Mrs. Rowland counseled a student who was homosexual and the student's mother was present. The mother was very upset with Mrs. Rowland and accused her of being homosexual also. Mrs. Rowland was concerned that the mother would complain to Mr. DiNino or Mr. Goheen, the assistant

principal, so she went to Mr. Goheen, and told him she was concerned about her job because she was bisexual. Mr. Goheen told her that she should not be concerned and that he would keep the matter confidential.

1.  Did Mrs. Rowland's statement to Mr. Goheen regarding her bisexuality in any way interfere with the proper performance of either Mrs. Rowland's or Mr. Goheen's duties or with the regular operation of the school generally? (In order to answer "NO", you must be satisfied by a preponderance of the evidence that it did not).

    YES      ✓ NO

2.  If your answer to question 1 was "YES", state in the notebook provided how the statement in question interfered with the performance of duties and/or how it interfered with the regular operation of the school.

3.  Are you satisfied by a preponderance of the evidence that Defendant DiNino's participation in the decision to suspend Mrs. Rowland was motivated at least in part by her statement to Mr. Goheen regarding her bisexuality?

    ✓ YES      NO

4.  Are you satisfied by a preponderance of the evidence that Defendant Hopper's suspension of Mrs. Rowland was motivated at least in part by her statement to Mr. Goheen regarding her bisexuality?

    ✓ YES      NO

5.  Are you satisfied by a preponderance of the evidence that Defendant DiNino's participation in the decision to transfer Mrs. Rowland to a position with no student contact was motivated at least in part by her statement to Mr. Goheen regarding her bisexuality?

    ✓ YES      NO

6.  Are you satisfied by a preponderance of the evidence that Defendant Hopper's transfer of Mrs. Rowland to a position with no student contact was motivated at least in part by her state-

ment to Mr. Goheen regarding her bisexuality?

✓ YES      NO

7.  Are you satisfied by a preponderance of the evidence that Defendant DiNino's participation in the recommendation to the Board of Education that Mrs. Rowland's contract not be renewed was motivated at least in part by her statement to Mr. Goheen regarding her bisexuality?

    ✓ YES      NO

8.  Are you satisfied by a preponderance of the evidence that Defendant Hopper's recommendation to the Board of Education that Mrs. Rowland's contract not be renewed was motivated at least in part by her statement to Mr. Goheen regarding her bisexuality?

    ✓ YES      NO

**SPECIAL VERDICT III**

In the fall of 1974 Mrs. Rowland made statements to fellow teachers at Stebbins High School regarding her bisexuality.

1.  Did Mrs. Rowland's statements to the teachers regarding her bisexuality in any way interfere with the proper performance of either Mrs. Rowland's or the teachers' duties or with the regular operation of the school generally? (In order to answer "NO", you must be satisfied by a preponderance of the evidence that they did not.)

    YES      ✓ NO

2.  If your answer to question 1 was "YES", state in the notebook provided how the statements in question interfered with the performance of duties and/or how they interfered with the regular operation of the school.

3.  Are you satisfied by a preponderance of the evidence that Defendant DiNino's participation in the decision to suspend Mrs. Rowland was motivated at least in part by her statements to the teachers regarding her bisexuality?

    ✓ YES      NO

4. Are you satisfied by a preponderance of the evidence that Defendant Hopper's suspension of Mrs. Rowland was motivated at least in part by her statements to the teachers regarding her bisexuality?

    ✓ YES          NO

5. Are you satisfied by a preponderance of the evidence that Defendant DiNino's participation in the decision to transfer Mrs. Rowland to a position with no student contact was motivated at least in part by her statements to the teachers regarding her bisexuality?

    ✓ YES          NO

6. Are you satisfied by a preponderance of the evidence that Defendant Hopper's transfer of Mrs. Rowland to a position with no student contact was motivated at least in part by her statements to the teachers regarding her bisexuality?

    ✓ YES          NO

7. Are you satisfied by a preponderance of the evidence that Defendant DiNino's participation in the recommendation to the Board of Education that Mrs. Rowland's contract not be renewed was motivated at least in part by her statements to the teachers regarding her bisexuality?

    ✓ YES          NO

8. Are you satisfied by a preponderance of the evidence that Defendant Hopper's recommendation to the Board of Education that Mrs. Rowland's contract not be renewed was motivated at least in part by her statements to the teachers regarding her bisexuality?

    ✓ YES          NO

## SPECIAL VERDICT IV

1. Are you satisfied by a preponderance of the evidence that Defendant DiNino's participation in the decision to transfer Mrs. Rowland to a position with no student contact was motivated at least in part because she had filed a lawsuit regarding her suspension?

    YES          ✓ NO

2. Are you satisfied by a preponderance of the evidence that Defendant DiNino's participation in the recommendation that Mrs. Rowland's contract not be renewed was motivated at least in part because she had filed a lawsuit regarding her suspension?

    YES          ✓ NO

3. Are you satisfied by a preponderance of the evidence that Defendant Hopper's transfer of Mrs. Rowland to a position with no student contact was motivated at least in part because she had filed a lawsuit regarding her suspension?

    YES          ✓ NO

4. Are you satisfied by a preponderance of the evidence that Defendant Hopper's recommendation that Mrs. Rowland's contract not be renewed was motivated at least in part because she had filed a lawsuit regarding her suspension?

    YES          ✓ NO

5. Are you satisfied by a preponderance of the evidence that the Board of Education voted not to renew Mrs. Rowland's contract at least partly because she had filed a lawsuit regarding her suspension?

    YES          ✓ NO

## SPECIAL VERDICT V

1. Are you satisfied by a preponderance of the evidence that Defendant DiNino, in participating in the decision to suspend Mrs. Rowland, treated her any differently than similarly situated employees, because she was homosexual/bisexual?

    ✓ YES          NO

2. Are you satisfied by a preponderance of the evidence that Defendant Hopper, in suspending Mrs. Rowland, treated her any differently than similarly situated employees, because she was homosexual/bisexual?

    ✓ YES          NO

3. Are you satisfied by a preponderance of the evidence that Defendant DiNino, in participating in the decision to transfer Mrs. Rowland to a position with no student contact, treated her any differently than similarly situated employees, because she was homosexual/bisexual?

    ✔ YES        NO

4. Are you satisfied by a preponderance of the evidence that Defendant Hopper, in transferring Mrs. Rowland to a position with no student contact, treated her any differently than similarly situated employees, because she was homosexual/bisexual?

    ✔ YES        NO

5. Are you satisfied by a preponderance of the evidence that Defendant DiNino, in participating in the recommendation that Mrs. Rowland's contract not be renewed, treated her any differently than similarly situated employees, because she was homosexual/bisexual?

    ✔ YES        NO

6. Are you satisfied by a preponderance of the evidence that Defendant Hopper, in recommending that Mrs. Rowland's contract not be renewed, treated her any differently than similarly situated employees, because she was homosexual/bisexual?

    ✔ YES        NO

7. Are you satisfied by a preponderance of the evidence that the Board of Education, in voting not to renew Mrs. Rowland's contract, treated her any differently than similarly situated employees, because she was homosexual/bisexual?

    YES        ✔ NO

8. Are you satisfied by a preponderance of the evidence that, at the time of her suspension, Mrs. Rowland was not performing her position as vocational guidance counselor in a satisfactory manner?

    ✔ YES        NO

9. If your answer to question 8 is "YES", state in the notebook provided in what way her performance was unsatisfactory. Please be specific.

### SPECIAL VERDICT VI

A school official acts in good faith if he acts sincerely and with a belief that he is doing right, and if his conduct is justified by an objectively reasonable belief that it was lawful. A school official does not act in good faith if he acts with malicious intention to deprive an employee, such as Mrs. Rowland, of her constitutional rights, or if he knew or reasonably should have known that his actions would violate her constitutional rights.

During the 1974–75 school year, there was no clearly established constitutional right to be homosexual or bisexual, or to have as one's sexual orientation and preference homosexuality or bisexuality. The law was uncertain concerning whether or not statements regarding bisexuality made in a high school setting were constitutionally protected.

1. Are you satisfied by a preponderance of the evidence that Defendant DiNino acted in good faith by participating in the decision to suspend Mrs. Rowland?

    ✔ YES        NO

2. Are you satisfied by a preponderance of the evidence that Defendant DiNino acted in good faith by participating in the decision to transfer Mrs. Rowland to a position with no student contact?

    ✔ YES        NO

3. Are you satisfied by a preponderance of the evidence that Defendant DiNino acted in good faith by participating in the decision to recommend nonrenewal of Mrs. Rowland's contract?

    ✔ YES        NO

4. Are you satisfied by a preponderance of the evidence that Defendant Hopper acted in good faith by suspending Mrs. Rowland?

    ✔ YES        NO

5. Are you satisfied by a preponderance of the evidence that Defendant Hopper acted in good faith by transferring Mrs. Rowland to a position with no student contact?

    ✓ YES           NO

6. Are you satisfied by a preponderance of the evidence that Defendant Hopper acted in good faith by recommending non-renewal of Mrs. Rowland's contract?

    ✓ YES           NO

**SPECIAL VERDICT VII**

1. Are you satisfied by a preponderance of the evidence that the Board of Education knowingly and intentionally voted not to renew Mrs. Rowland's contract?

    ✓ YES           NO

2. If your answer to question 1 is "YES", do you find that the Board of Education acted for any reason other than the recommendation of the superintendent, Dr. Hopper, when it voted not to renew Mrs. Rowland's contract?

    YES           ✓ NO

3. If your answer to question 2 is "YES", state the reason for the Board's action in the notebook provided.

**SPECIAL VERDICT VIII**

1. If Mrs. Rowland had not been bisexual and if she had not told teachers and Mrs. Monell, the secretary, of her sexual preference, are you satisfied by a preponderance of the evidence that she would have been suspended anyway for other reasons?

    YES           ✓ NO

2. If the answer to question 1 is "YES", state the other reasons in the notebook provided.

3. If Mrs. Rowland had not been bisexual and if she had not told teachers and Mrs. Monell, the secretary, of her sexual preference, are you satisfied by a preponderance of the evidence that she would have been transferred to a posi-

tion with no student contact anyway for other reasons?

    YES           ✓ NO

4. If the answer to question 3 is "YES", state the other reasons in the notebook provided.

5. If Mrs. Rowland had not been bisexual and if she had not told teachers and Mrs. Monell, the secretary, of her sexual preference, are you satisfied by a preponderance of the evidence that her contract would not have been renewed anyway for other reasons?

    YES           ✓ NO

6. If the answer to question 5 is "YES", state the other reasons in the notebook provided.

9. In what way was Mrs. Rowland's performance in her position as vocational guidance counselor unsatisfactory?

*Her performance was unsatisfactory because she revealed to Mrs. Monell the sexual orientation of two students when it was not necessary to do so.*