Filed 4/29/13  P. v. Lopez CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>TEOFILO EPIFANIO LOPEZ,<br><br>    Defendant and Appellant. | G046238<br><br>(Super. Ct. No. 09NF0993)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, James Edward Rogan, Judge.  Affirmed.

Dacia A. Burz, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Lilia E. Garcia and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Teofilo Epifanio Lopez appeals from a judgment convicting him of six counts of committing lewd acts on a child under the age of 14 (Pen. Code, § 288, subd. (a).) Four of the counts were committed against Jane Doe 1, one count was committed against her sister, Jane Doe 2, and one count was committed against an unrelated victim, John Doe 1. Defendant was sentenced to an aggregate term of 60 years to life in prison.

Defendant argues the court prejudicially erred by: (1) allowing the jury to hear evidence that he was bisexual, to show he had sexual interest in both male and female children and thus the intent to commit all of the charged crimes; (2) allowing the jury to hear recordings of conversations he had with the mother of the two female victims in which she "vouched" for the honesty of her daughters; (3) failing to redact especially "inflammatory" portions of those taped conversations; and (4) allowing the jury to consider evidence of the other charged crimes as "propensity" evidence in deciding his guilt on each count. We find none of these arguments persuasive and affirm the judgment.

We agree with the Attorney General that sexual orientation is "certainly irrelevant on the question of whether a person is a pedophile or child molester." But while defendant's bisexuality is not relevant to demonstrate he might be *inclined to pedophilia*, it was nonetheless relevant to demonstrate why his pedophilic tendencies might extend to children of *both genders*, as was charged in this case. In fact, the notion that pedophiles tend to prey on only one gender or the other is so ingrained that defendant himself relies on it to support his contention that the court abused its discretion by allowing the jury to consider charges involving victims of one gender as evidence of propensity for charges involving the other. Evidence that defendant is sexually attracted to both genders provides the relevant link among these otherwise disparate charges, and thus the court did not abuse its discretion by allowing the jury to hear it.

2

Similarly, the court acted appropriately in allowing the jury to hear essentially the entirety of the recorded conversations between defendant and the mother of his female victims. As the court explained, context was important in determining whether defendant's equivocal responses to the mother's assertions could be reasonably viewed as adoptive admissions. Moreover, a mother's bias toward her children would be expected – there's a reason we would not allow a mother to sit on a jury evaluating charges involving her own child – and thus her defense of their honesty when speaking with the man they claim molested them would be unlikely to prejudice a jury unacquainted with any of them.

And the court's instruction allowing the jury to consider the other charged crimes as evidence of propensity to commit a sex crime has recently been approved by our Supreme Court. (*People v. Villatoro* (2012) 54 Cal.4th 1152.) The mere fact the child victims in this case were not all of the same gender was not, in and of itself, "a highly significant dissimilarity making the propensity inference unwarranted."

Finally, in light of our rejection of defendant's claims on the merits, his contention that trial counsel was ineffective for failing to assert those same arguments below is moot.

FACTS

*1. The Incidents Involving Jane Doe 1 and Jane Doe 2*

Jane Doe 1, born in July 1995, and Jane Doe 2, born in April 1990, are sisters. Defendant is their mother's uncle and godfather, and they have known him their entire lives. At the time of trial, Jane Doe 2, the elder of the sisters, was 20 years old. She testified to one incident of molestation occurring when she was seven years old and living with her family at her grandmother's home.

3

According to Jane Doe 2, the incident occurred when she was napping on a bed in her grandmother's bedroom. She awoke from her nap when she heard someone opening the door, saw that it was defendant, and pretended to remain asleep. Defendant sat on the bed next to her, lifted up her shirt, and massaged her right breast. He put his mouth on her left nipple and sucked on it. She was scared and did not react. After he finished, he left the room and she remained on the bed until she could no longer hear his voice in the house. She did not tell anyone else what had occurred because she thought no one would believe her, but thereafter she avoided defendant.

Jane Doe 1, who was 15 years old at the time of trial, testified that from the time she was small, defendant often told her he loved her very much, and even told her he was "obsessed" with her. He also told her he kept pictures of her by his bed so he could see her whenever he woke up. She described sitting in defendant's lap at times during the period between when she was in kindergarten and fourth grade. Many times, he would rub her back, stomach or breast area under her clothing. He sometimes rubbed or squeezed her buttocks over her clothing.

When Jane Doe 1 was in the third and fourth grades, defendant sometimes drove her to a nearby store. While in the parking lot, he would hold her wrists and insist she kiss him before allowing her to get out of the car. On one occasion, he tried to kiss her on the lips, but she turned away so he kissed only the corner of her mouth.

When Jane Doe 1 was nine or 10 years old, defendant gave her driving lessons. He had her sit in his lap, with both of their hands on the steering wheel. Several times, she could feel his penis pressing against her buttocks. After those incidents, she became too scared to go with him anymore, and told him she could not go.

Although Jane Doe 1 realized what defendant did to her was wrong, she did not tell her mother for a very long time because "he was family and I didn't want them to be mad at me . . . ." When she was about 11 years old, Jane Doe 1 did tell some female

4

cousins and their parents that defendant made her uncomfortable when he hugged her. Her aunt advised her not to sit on his lap, hug him, or be alone with him.

Finally, however, in March 2008, Jane Doe 1 told her sister, Jane Doe 2, about what defendant had done to her, because she wanted "to protect other people." Both girls then told their mother about what had occurred, and a week or two later their mother took them to the police to make a formal report.

*2. The Recorded Phone Calls Admitted into Evidence*

Some months after the girls reported the incidents to the police, a detective asked their mother to place a phone call to defendant, which would be recorded in an effort to obtain information from him. Ultimately, the girls' mother placed two phone calls to defendant in September 2008.

During the first of the recorded phone calls, which were admitted into evidence, the girls' mother told defendant Jane Doe 1 was having "questions and stuff about like sexuality and stuff." She asked defendant "what is it that you like about women? Like do you feel like you're gay? Or do you feel like you like women?" He responded that he is bisexual and asked if that was "okay." She then told him Jane Doe 1 had said he claimed to have been obsessed with her. He denied ever saying that, even after Jane Doe 1's mother insisted that she "doesn't lie." He claimed Jane Doe 1 must have "misunderstood, because you know I'm a very affectionate person" and again denied ever saying he was obsessed: "Oh no-no nothing like that. Yuck!" A few moments later, and before Jane Doe 1's mother made any reference to sexual contact, defendant stated "she's really a sweetie, but as far as sexual things come . . . it never even entered my mind, never."

The first phone call was abruptly terminated when the girls' mother, who had claimed to be calling from a friend's house, stated "my friend's line is ringing. Can I call you right back?" She called back 10 minutes later. In the second phone call, she

stated up front that "I talked to my girls[;] they came to me and they told me[,] they told me everything . . . ." When defendant indicated he did not know what she was talking about, and she clarified "[e]verything that you've done." He denied "do[ing] anything," to which she responded "[t]hey are not liars . . . ." Defendant again denied "do[ing] anything to anybody," but followed that with "You know I'm a very affectionate person. . . . But *as far as a sexual thing* no, I've never even . . . [i]t's never even entered my mind. *They were just babies, you know*." (Italics added.)

It was only after defendant denied "a sexual thing" that the girls' mother got specific. She told him Jane Doe 1 had said he had "touched her breasts." He denied it, but when she told him the touching happened when Jane Doe 1 was six or seven, he responded "[a]t that age, no. They were kind of big. When they were little[,] I may you know picking them up and stuff, but[] . . . ." The girls' mother then said "I know everything," emphasizing that her girls were "not liars" and "I believe them." Defendant replied, "I don't remember ever touching her but I may have spanked her or something but not you know *just sit there and fondle her*." (Italics added.) Again, at that point in the conversations, the girls' mother had yet to mention Jane Doe 1's description of defendant's tendency to rub her breasts under her shirt while holding her in his lap.

Defendant also denied any recollection of taking Jane Doe 1 in the car for "driving lessons," but acknowledged "we went to the 99 Cents store I think once and . . . maybe twice that's about all." When asked if she sat on his lap, he again denied any recollection of giving driving lessons to Jane Doe 1, claiming "We just drove and-and bought the stuff and went right back to the house." The girls' mother then demanded "[s]o [Jane Doe 1] is lying?" and again "[Jane Doe 1] is a liar?" Defendant responded he could not say that "[be]cause I don't know what you know . . . . I don't know what all she's thinking."

When the girls' mother asked defendant again about touching Jane Doe 1's breasts, he seemed to have forgotten which daughter they were speaking about,

6

responding "I touched her breasts too?  Recently?"  He then said "I don't want to say your kids are lying or anything but . . . [n]o I just made sure I didn't do that kind of thing 'cause I didn't want things like this . . . me-me accused of something like that."  It was only after that denial that the girls' mother mentioned the allegation made by Jane Doe 2: "[W]hy-why did you suck on [Jane Doe 2]'s breasts when she was little?"  Defendant responded "I did?"  When she again asked him "[w]hy did you do that to her," he denied doing it, but then followed that denial by saying "I don't think so mija.  I don't think I did that.  I may have kissed her."

The girls' mother reiterated her belief in their veracity, and told defendant "[s]o I need you to tell me what you did.  I want you to just tell me. [¶]. . . [¶]  Nobody has to know but us."  When she asked defendant again about touching Jane Doe 1's breasts, he again denied it somewhat equivocally:  "No! I never touched her.  Not that I reme– You know go intentionally touch her.  No! [Pause]  Especially you know uh big girls like that.  Oh no!"

When asked specifically about kissing Jane Doe 2's breasts, defendant responded that he "[didn't] remember kissing her breasts," and stated "[i]t didn't seem like something I would do."  A few moments later, defendant mentioned this was not the first time he had been accused of inappropriately touching a little girl.  He referred to it as "stuff that never happened you know but it just seemed like it did but it didn't."  When the girls' mother asked for details about the earlier accusation, he described an incident in which he was babysitting the young daughter of a different niece, plus another little girl, and the other girl had snatched his hat away and then claimed he molested her when he tried to get it back.  He explained that the innocence of his conduct had been corroborated by his grand-niece.  The mother of the two Jane Does told him she "[didn't] know about that little girl, but . . . [a]s far as my girls are concern[ed] . . . [¶] . . . [¶] . . . I believe my girls."

7

Defendant offered to come over and apologize to Jane Doe 1 and Jane Doe 2, but again denied having done anything inappropriate "purposely." The second phone call was concluded shortly thereafter.

Defendant was also interviewed by police. Although defendant alternately denied *doing* the things claimed by Jane Doe 1 and Jane Doe 2, and denied *remembering* them, he did acknowledge that the characterization of him "accidentally" kissing the breasts of Jane Doe 2, but realizing it was a mistake and never doing it again, was true. He later denied doing anything "else" to her. Defendant also admitted Jane Doe 1 was "special" to him.

### 3. The Incident Involving John Doe

The other count alleged against defendant involved John Doe, who was seven years old at the time of trial. He testified about an incident that occurred when he was approximately five years old and living in an apartment near to defendant's. According to John Doe's testimony, while he was playing outside in the yard between the apartments, defendant used his hand to squeeze John Doe's penis.

John Doe had told different versions of the incident in earlier interviews with police, initially denying anyone had touched him, and later stating, "Teofilo" had touched his "pee-pee" with his mouth. The location of the incident also changed, with John Doe claiming at times the incident had happened inside the house.

Defendant's goddaughter, Michelle Martinez, also testified. She claimed to have a close relationship with defendant, "where [she] would not judge him," and thus "he felt comfortable with me." She described an incident a couple of years earlier in which he'd told her that he had sucked the penis of a little boy in the neighborhood. When she asked him for a name, however, he denied having done it, and claimed "he was just playing." Martinez questioned him about the claim later, however, and he did not deny it. Instead, he told her "I didn't mean to . . . I don't know what I was thinking."

8

Although Martinez tried to get defendant to name the boy, he would never tell her. She did not report the information to the police until October 2008, when a police detective contacted her. She then revealed what defendant had told her.

Martinez also testified that during her visits to defendant's home, she noticed he kept and displayed photographs of young girls that appeared to be cut from underwear advertisements in catalogs. When she asked him about the photographs, he told her she was "looking at it in the wrong way. They were pure and innocent."

And during his interview with police, defendant explained that John Doe was always urinating in front of him in the yard, and he acknowledged putting his mouth on the boy's penis for "a second," explaining it was "curiosity probably." When the officer asked defendant how long he had been interested in children, he responded "I don't know, it just started."

DISCUSSION

*1. Defendant's Waiver of Alleged Errors in the Trial Court*

Before addressing the merits of defendant's claims we must acknowledge his frank admission that most of the alleged errors he complains of were not specifically objected to by his trial counsel below. Despite what might otherwise be deemed a waiver of these claims, we will exercise our discretion to consider them on the merits. The Attorney General does not urge us to find waiver and has addressed each contention on its merits. Moreover, because defendant also claims that his trial counsel's failure to specifically make and preserve for appeal each of the arguments he now relies upon would qualify as ineffective assistance of counsel, we promote judicial efficiency by simply addressing the issues now, rather than waiting to be presented with a writ of habeas corpus. (See *People v. Thurman* (2007) 157 Cal.App.4th 36, 43, fn. 5; see also

9

*People v. McWhorter* (2009) 47 Cal.4th 318, 373 [finding issue waived, but addressing it anyway].)

### 2. Evidence of Defendant's Bisexuality

Defendant first argues the court abused its discretion by admitting "irrelevant" evidence of his bisexuality to show he had sexual interest in male and female children, and thus the specific intent to commit the charged offenses. In reviewing such an assertion, we keep in mind that "[t]he trial court has broad discretion in decisions relating to the admission of evidence. We review the court's evidentiary decisions under the deferential abuse of discretion standard. [Citations.] Evidence is relevant if it has any tendency in reason to prove or disprove a disputed fact." (*People v. Loza* (2012) 207 Cal.App.4th 332, 345.)

Defendant asserts "[h]omosexual tendency is irrelevant and inadmissible to prove disposition to commit sex offenses against minors." (Citing *People v. Giani* (1956) 145 Cal.App.2d 539.) We agree with that statement as far as it goes, but unfortunately for defendant, it doesn't go very far. Defendant makes no showing that either the court or the prosecutor ever sought to *equate* defendant's bisexuality with pedophilia – the tendency to commit sexual offenses against minors. Indeed, the Attorney General makes clear in its brief that a defendant's sexual orientation is "irrelevant on the question of whether a person is a pedophile or child molester."

Instead, the evidence of defendant's bisexuality was relied upon to explain why his pedophilia *extended to children of both genders*. As defendant himself asserts in a later portion of his brief, there is a widely held belief that most pedophiles molest children of only one gender – hence defendant's assertion that the court also abused its discretion by allowing the jury to consider his molestation of Jane Does 1 and 2 as propensity evidence in connection with his molestation of John Doe, and vice versa. As defendant expressed it, "the gender of the victims was a significant dissimilarity on the

10

charged section 288 offenses involving Jane Does 1 and 2.  In fact, the male or female gender of the child victims on the charged offenses is an important dissimilarity that reasonabl[y] tended to negate an inference of propensity to commit the offense from other charged offenses."

By making that later argument, defendant illustrated why evidence of his bisexuality was properly admitted; it was probative of his motive and intent to commit sex crimes against children of *both genders*.  (Evid. Code, § 1101, subd. (b) ["Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act"].)

Defendant's claim that the evidence of his bisexuality should have been excluded as unduly prejudicial under Evidence Code section 352 is likewise unpersuasive.  The assertion is based on two faulty premises:  first, that the evidence had miniscule, if any, probative value; and second, that homosexuals are viewed with more "pernicious and sustained hostility" by the general public than any other group. (*Rowland v. Mad River Local Sch. Dist.* (1985) 470 U.S. 1009, 1014 [105 S.Ct. 1373, 84 L.Ed.2d 392] (dis. opn. of Brennan, J.).)  As we have already explained, we agree with the trial court's assessment of the probative value.  And however accurate was Justice Brennan's assessment of the societal hostility toward homosexuals in 1985, that opinion was neither admitted into evidence below, nor is presumably reflective of the jury's likely attitude toward homosexuality when this case was tried in 2010.  Consequently, we find no abuse of discretion in the trial court's decision to allow the jury to hear evidence that defendant was bisexual.

11

*3. Admission of Recorded Phone Calls*

Defendant next contends the trial court abused its discretion by allowing the jury to hear the recorded phone calls between defendant and the mother of Jane Does 1 and 2. His first point is that the conversations should have been excluded in their entirety, as hearsay. (Evid. Code, § 1200.) However, the hearsay rule excludes only statements which are "offered to prove the truth of the matter stated" (Evid. Code, § 1200, subd. (a)), and does not apply to a statement "offered against the declarant in an action to which he is a party in either his individual or representative capacity, regardless of whether the statement was made in his individual or representative capacity." (Evid. Code, § 1220.)

Here, the taped conversations were a combination of statements which were either not offered for the truth of the matter stated – the statements made by the mother of Jane Does 1 and 2 which were offered to provide context for defendant's responses – or were defendant's own statements offered against him. Although it is true some of defendant's statements were flat denials of the charged conduct, and thus that those statements, if considered in a vacuum, would probably not have been viewed as attractive evidence to be offered against him, the trial court explained why it viewed the conversations, as a whole, to be damning: "[A]lthough there [are] a number of times where [defendant] makes flat denial[s], . . . [t]here are other times where the court feels that the heartiness of the denials are somewhat weaker than one would normally make when confronted with similar allegations. [¶] The court finds that, on balance, the bulk of the rest of the tapes would qualify as an adoptive admission."

Defendant's argument focuses specifically on what the court characterized as his "flat denial[s]" and cites *People v. Simmons* (1946) 28 Cal.2d 699, for the proposition that *such denials* are inadmissible hearsay. But *Simmons* does not address the admissibility *of the denials*; those are admissible because they are defendant's own statements offered against him. What *Simmons* addresses is the admissibility of third-

12

party descriptions of defendant's alleged wrongdoing, holding they are not made admissible for the truth of the matter stated on the basis of defendant's response to them, if defendant's response was simply a flat denial.

And if what defendant actually meant to do here was argue these specific statements made by the mother of Jane Does 1 and 2 could not be considered for the truth of the matter stated, because they were followed by his "flat denial," he failed to make that case. In fact, he fails to even identify those alleged statements, let alone show that they were offered for the truth of the matter. Nor did he explain how they differed materially from the other statements he did not flatly deny, or why exclusion of those specific statements might have made any difference. Thus, to the extent defendant is actually claiming the court erred by failing to edit out specific statements made by the girls' mother that he flatly denied, on the basis that *those specific statements* constituted hearsay, he has waived that claim.

Defendant's next contention is that the court abused its discretion by allowing the jury to hear the mother of Jane Does 1 and 2 repeatedly vouch for the veracity of her daughters. According to defendant, the prejudicial effect of her "improper lay opinion" about her daughters' veracity far outweighed "the dubious and slight probative value of [defendant's] denials." Again, we are unpersuaded by defendant's assessment of both the prejudicial effect of the mother's vouching, and the probative value of his responses.

A mother's staunch defense of her daughters' veracity, when at the behest of police she is confronting the man they have accused of sexual molestation, is to be expected. And if the jury in this case did not otherwise *assume* the girls' mother believed them, they would certainly have discerned that from the fact (otherwise in evidence) that she took them to the police to make a report shortly after learning of their accusations, and then complied with the police officer's request to make recorded phone calls to defendant in an effort to obtain incriminating evidence.

13

Further, defendant's characterization of the mother's stated belief in her daughters' veracity as "improper lay opinion" changes nothing. There is no indication anyone believed she was purporting to offer neutral opinion testimony about her daughters' truthfulness. Her obvious and expected bias in their favor is exactly why she would never have been allowed to offer such an opinion if asked to do so during testimony. There is simply no basis to infer the jury would have been prejudiced by the knowledge she believed her daughters were truthful.

But more significant is our agreement with the trial court's assessment of the significant probative value of the taped conversations. They are not, as defendant suggests, simply a series of the mother's accusations followed by a series of defendant's denials expressed with greater or lesser vehemence. In our view, the conversations are quite damning, particularly because they reflect that defendant understood he was being accused of molesting the girls *before he was actually accused of it*. The girls' mother starts off the first call by stating that Jane Doe 1 was having "questions and stuff about like sexuality and stuff," and then asking defendant if he "fe[lt] like you're gay? Or do you feel like you like women?" After he told her he was bisexual, and asked if that was okay, he denied ever telling Jane Doe 1 he was obsessed with her and claimed she must have "misunderstood, because you know I'm a very affectionate person." A few moments later, and before Jane Doe 1's mother made any reference to sexual contact, defendant stated "she's a real sweetie, but as far as sexual things come . . . it never even entered my mind, never."

While an innocent person might have assumed from that conversational opening that Jane Doe 1's mother was attempting to broach the subject of Jane Doe 1's sexuality – i.e., the possibility Jane Doe 1 herself might be gay or bisexual – defendant assumed instead that she was asking him about *molestation*. An obvious inference to draw from that exchange is that defendant was not innocent of molestation. Later in the conversation, defendant assumed the girls' mother was also accusing him of molesting

14

Jane Doe 2 – again, before she had actually done so. And the fact that defendant, on more than one occasion, seeks to clarify the girl's age before assuring her mother he would not do that with a girl who was so "big," implies an acknowledgment that he would do such things to a younger girl. Finally, defendant's repeated claims that he *doesn't remember* the alleged acts of molestation could easily be viewed as an admission. The jury could reasonably conclude that people who have never molested a child would not have to search their memories to respond to such an accusation – in much the same way that people who have never robbed a bank would not be expected to respond to the accusation they did so by saying "as far as I can recall I have never robbed a bank."

Because we conclude the trial court did not err in its assessment of the significant probative value of the taped conversations, and we find the mother's statements vouching for the credibility of her daughters to have little or no prejudicial effect, we conclude it did not abuse its discretion by allowing the jury to hear essentially the entirety of those conversations.

Defendant's last point in connection with the taped conversations is his contention that the court erred by not striking the mother's statement, made in response to one of defendant's denials of the driving lessons: "so [Jane Doe 1] is lying, [¶] [Jane Doe 1] is a liar?" Defendant relies on *People v. Chatman* (2006) 38 Cal.4th 344, 381-382, for the proposition that it is often improper to ask a defendant whether someone else is lying. However, *Chatman* concerns the propriety of posing such questions to a defendant during cross-examination at trial – and holds that the propriety of such questions depends on context – and has nothing to do with whether such questions posed to a defendant by a third party during a telephone conversation would be admissible into evidence. In our view, the questions are no more or less inflammatory than the mother's other averments of belief in her daughters' veracity, and in the absence of some special rule prohibiting such statements from evidence, we find no error in the trial court's refusal to strike it.

15

*4. Jury Instruction on Considering Charged Crimes as Evidence of Propensity*

Defendant's final contentions concern the court's instruction to the jury that it could consider each of the incidents charged in this case as evidence that defendant had a disposition to commit the other charged offenses.

Specifically, the jury was instructed, in pertinent part: "The People presented evidence that the defendant committed the crimes of lewd act upon a child under 14. . . . [¶] If you decide that the defendant committed one or more of these offenses beyond a reasonable doubt, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit other charged offenses of lewd act upon a child under 14. [¶] If you conclude that the defendant committed one or more of these offenses, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of other charged offenses of lewd act upon a child under 14."

The instruction was prompted by Evidence Code section 1108, subd. (a), which provides: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." Evidence Code section 1101 is the statute which otherwise prohibits admission of evidence that defendant had committed prior similar offenses as a means of showing he is predisposed to commit such crimes. (Evid. Code § 1101, subd. (b) ["Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact . . . other than his or her disposition to commit such an act"].)

Defendant's first contention is that the court erred by allowing the jury to consider evidence of other *charged* offenses, as opposed to evidence of *uncharged* acts, as evidence establishing his disposition to commit the crimes. He points to a split of

16

authority in the intermediate appellate courts on the issue, and argues the better reasoned position is the one holding that the jury cannot consider evidence of *charged* offenses to establish defendant's propensity to commit any of the *other* charged offenses. However, shortly after defendant filed his opening brief, our Supreme Court resolved the conflict, ruling against defendant's argument. In *People v. Villatoro, supra*, 54 Cal.4th at pp. 1162-1163, the court held that Evidence Code section 1108 authorized consideration of defendant's other similar charged acts to demonstrate his disposition to commit such acts. We are bound by that decision, and thus need not consider the contention further.

Defendant contends the court nonetheless erred by giving the instruction, because the gender difference between victim John Doe on the one hand, and victims Jane Does 1 and 2 on the other, made the charged crimes against those victims so inherently dissimilar that the jury should not have been allowed to consider evidence of defendant's commission of a lewd act on John Doe as evidence of his disposition to commit lewd acts on Jane Does 1 and 2, or vice versa. But as we have already noted, this argument is flawed because it is based wholly on the *assumption* that pedophiles necessarily target only one gender or the other and ignores the evidence defendant himself is bisexual – i.e., sexually interested in *both* genders.

Defendant's assertion that pedophiles limit their victims to children of one gender is supported by nothing more than a quotation from *People v. Jeffers* (1987) 43 Cal.3d 984, which in turn is characterizing testimony before a legislative committee about the "distinction between offenses of pedophilia and incestuous or intrafamily offenses." (*Id.* at p. 994, fn. omitted.) Nothing in the quote purports to place a gender-specific limit on the scope of pedophilia, nor to establish that a person's commission of offenses of pedophilia and those of an incestuous or intrafamily nature would be somehow inconsistent. And even if it did, it would not qualify as *evidence* supporting such factual conclusions *in this case*.

17

If defendant wished to persuade either the jury or this court that the commission of pedophilia would necessarily be limited to victims of one gender or the other, it was incumbent upon him to offer some admissible evidence at trial supporting that assertion. By failing to do so, he waived any such claim and consequently cannot rely on it to suggest the trial court abused its discretion when it allowed the jury to consider acts of pedophilia committed against a victim of one gender to show a disposition to commit such acts against a victim of the other gender.

5. *Claim of Ineffective Assistance of Counsel*

In light of our determination that the trial court did not err in making any of the rulings defendant challenges on appeal, his claim that his trial counsel provided him with ineffective assistance by failing to specifically object to those rulings is moot.

DISPOSITION

The judgment is affirmed.

RYLAARSDAM, J.

WE CONCUR:

O'LEARY, P. J.

FYBEL, J.

18